## Bellefonte Area School Board v. The Bellefonte Area Education Association, et al.

Argued April 5, 1973, before President Judge BOW-MAN and Judges CRUMLISH, JR., KRAMER, MENCER, ROGERS and BLATT. Judge WILKINSON, JR. disqualified himself and did not participate.

*Thomas A. Walrath,* with him *William A. Hebe* and *Spencer and Gleason,* for appellants.

*John R. Miller,* with him *Miller, Kistler & Campbell, Inc.,* for appellee.

*William Fearen,* with him *Cleckner & Fearen,* for amicus curiae, Pennsylvania School Board Association.

OPINION BY JUDGE ROGERS, May 23, 1973:

When Legislatures finally determine to adopt a wholly new concept of public management, they usually do so in terms more expressive of their fear of the unforeseeable harm which may result from the new policy than of their confidence in the good it will accomplish. Hence, such legislation is often tentative, imprecise, elliptical and incomplete, leaving the hard choices either to the improbable chance that they "may not come up," or to the courts. The Public Employe Relations Act, Act of July 23, 1970, P. L. 563, 43 P.S. §1101.101 et seq., is an example of such legislation. It reverses the immemorial policy of state government to prohibit public employes from striking. It countenances strikes by public employes, but only upon the condition that cer-

tain ill-defined procedures have first been accomplished; and it empowers the courts to enjoin perfectly legal strikes if the courts find that they create "a clear and present danger or threat to the health, safety or welfare of the public."[1]

The court below in this case was called upon to determine both questions; that is, whether the procedures prerequisite to a legal strike were accomplished and, if so, whether, nevertheless, the strike should be enjoined as a clear and present danger or threat to the health, safety or welfare of the public.

The Bellefonte Area Education Association is the certified employe representative of the teachers, guidance counselors, school nurses and librarians of the Bellefonte Area School District. An agreement between the Association and the District, due to expire June 30, 1972, became the subject of collective bargaining negotiations between the parties commencing in February of 1972. After a short period of negotiations, a mediator was appointed by the Pennsylvania Bureau of Mediation who, after meeting with the parties and in accordance with Section 802 of the Act, *infra,* certified to the Pennsylvania Labor Relations Board on February 24, 1972 that an agreement had not been achieved. The Labor Relations Board did nothing and the parties continued to negotiate with help of the mediator from time to time, until the Association, after notice of its intention to do so, took its members out

---

[1] However difficult it may be to envision a strike of public employes which would not constitute a threat to the public welfare, this court has nonetheless unanimously held that the Act did not intend that courts should enjoin strikes by public employes because they produce effects normally incident to a strike. *Armstrong School District v. Armstrong Education Association,* 5 Pa. Commonwealth Ct. 378, 291 A. 2d 120 (1972). *Compare Ross v. Philadelphia Federation of Teachers,* 8 Pa. Commonwealth Ct. 204, 301 A. 2d 405 (1973).

on strike on September 11, 1972. On September 26, 1972, the School District filed its complaint seeking an injunction; and a preliminary injunction was granted on September 28, 1972, continued after a hearing on October 3, 1972 and made permanent on November 16, 1972.

The injunction entered in the court below was based upon the court's conclusion that the procedures prerequisite to the strike had not been wholly accomplished and its determination that the health, safety and welfare of the public was threatened or endangered.

We have carefully reviewed the record and have concluded that the facts and circumstances do not support the court's ultimate finding that the strike endangered or threatened the health, safety or welfare of the public. The strike was attended with no violence or, indeed, with anything which could be characterized as unpleasantness, except as the clash of wills and opinions evidenced in the testimony must have been disturbing to persons on both sides. The chancellor based his judgment that the public interest was endangered on two considerations. The first was that state reimbursement to the District would be lost if the District failed to provide 180 days of instruction during the school year ending June 30, 1973. On September 28, 1972, when the preliminary injunction was granted, 13 instructional days had been lost in the strike. However, there remained 15 days of summer vacation time and an unspecified number of days set aside for holidays during the remaining school term which could have been used to supply days lost by the strike. As we said in *Armstrong School District v. Armstrong Education Association*, 5 Pa. Commonwealth Ct. 378, 385-6, 291 A. 2d 120, 124-5 (1972): "The danger that the District will lose state subsidies because of a strike would be proper grounds for enjoining the strike if

such danger were 'clear and present.' And, although it is not certain that subsidies will in fact have to be withheld because of the strike, it is a possibility which cannot be ignored. If the strike lasted so long, therefore, that any continuation would make it unlikely that enough days would be available to make up the 180 required, the teachers could be properly enjoined from continuing it. At the time of the last hearing, however, the strike had lasted only 12 days, and the District had 20 days available in June plus 19 holiday dates which could be used to make up time lost. The possibility that the strike would extend longer than the make-up time available did not yet exist. If a strike is to be enjoined on the basis that insufficient make-up time actually will exist, the strike must at the very least have reached the point where its continuation would make it either clearly impossible or extremely difficult for the District to make up enough instructional days to meet the subsidy requirement within the time available. This strike was far from that point when the Court below enjoined it." We believe this statement to be apposite here.

The other danger or threat to the public welfare found by the court lay in the possible loss to the District of its so-called "quality assessment program." This activity, sponsored by the Pennsylvania Department of Education, is designed to assess the quality of education in Bellefonte Area Schools and to provide the District with a comparison of the effectiveness of its effort with that of other schools across the country. The suggestion is made that should the District be forced to suspend this program, it would not have an early opportunity to participate anew. However useful to the District such a program might be, its loss cannot, we believe, be so harmful as to be the occasion for denying to the District's employes rights conferred by

the Public Employes Relations Act. It, and other desirable things, including many extracurricular activities which are the delight of secondary school life, were bound to be lost to districts undergoing strikes, which the Legislature decided, when it passed the Act, were required to be sanctioned in order "to promote orderly and constructive relationships between all public employers and their employes." Section 101 of the Public Employe Relations Act, 43 P.S. §1101.101.

More difficult to review is the lower court's conclusion that the strike was illegal because the procedures prescribed by Sections 801 and 802, *infra*, as conditions precedent to strike action had not been fully accomplished.

We quote the statutory provisions involved:

"Strikes by public employes during the pendency of collective bargaining procedures set forth in sections 801 and 802 of Article VIII are prohibited. In the event of a strike during this period the public employer shall forthwith initiate an action for the same relief and utilizing the same procedures required for prohibited strikes under section 1001." Section 1002 of the Public Employe Relations Act, 43 P.S. §1101.1002.

"If after a reasonable period of negotiation, a dispute or impasse exists between the representatives of the public employer and the public employes, the parties may voluntarily submit to mediation but if no agreement is reached between the parties within twenty-one days after negotiations have commenced, but in no event later than one hundred fifty days prior to the 'budget submission date,' and mediation has not been utilized by the parties, both parties shall immediately, in writing, call in the service of the Pennsylvania Bureau of Mediation." Section 801, 43 P.S. §1101.801.

"Once mediation has commenced, it shall continue for so long as the parties have not reached an agree-

ment. If, however, an agreement has not been reached within twenty days after mediation has commenced or in no event later than one hundred thirty days prior to the 'budget submission date,' the Bureau of Mediation shall notify the board of this fact. Upon receiving such notice the board may in its discretion appoint a fact-finding panel which panel may consist of either one or three members. If a panel is so designated or selected it shall hold hearings and take oral or written testimony and shall have subpoena power. If during this time the parties have not reached an agreement, the panel shall make findings of fact and recommendations:

"(1) The findings of fact and recommendations shall be sent by registered mail to the board and to both parties not more than forty days after the Bureau of Mediation has notified the board as provided in the preceding paragraph.

"(2) Not more than ten days after the findings and recommendations shall have been sent, the parties shall notify the board and each other whether or not they accept the recommendations of the fact-finding panel and if they do not, the panel shall publicize its findings of fact and recommendations.

"(3) Not less than five days nor more than ten days after the publication of the findings of fact and recommendations, the parties shall again inform the board and each other whether or not they will accept the recommendations of the fact-finding panel.

"(4) The Commonwealth shall pay one-half the cost of the fact-finding panel; the remaining one-half of the cost shall be divided equally between the parties. The board shall establish rules and regulations under which panels shall operate, including, but not limited to, compensation for panel members." Section 802, 43 P.S. §1101.802.

As we have earlier noted, the parties negotiated and submitted to mediation and the Bureau of Mediation notified the Pennsylvania Labor Relations Board that no agreement had been reached. The Board did not appoint a fact-finding panel as it was empowered to do by Section 802. The court below held that fact-finding was a required procedure under Section 802 not accomplished in this case and that the strike was illegal under Section 1002. The court suggested that the defendant Association before striking should have requested or demanded that the Board appoint fact finders. We respectfully disagree.

Section 802 clearly leaves the decision of whether a fact-finding panel should be appointed entirely with the Board. We can agree with the court below that fact-finding is often useful in the resolution of labor disputes, but we are constrained to read the Act to provide that whether it is to be employed in any particular case is for the Board to decide. Hence, we are inclined to view the Board's failure to act during a period from February 24, 1972 until September 8, 1972, during all of which time a representative of the Bureau of Mediation, which on the earlier date had certified a disagreement, continued to meet with the parties, not as an oversight but as a determination that fact-finding should not be employed in this case. Furthermore, we can find nothing in the Act which imposes upon the employes an obligation to stir up an inert Board. Our construction is strengthened by the provision of Section 802 imposing upon the fact finders and the parties strict temporal limitations in the performance of their fact-finding duties. These strictures are consistent with the large lead times imposed for the commencement of negotiations and for the notification of an impasse, as expressive of legislative intent that the parties start early and proceed expeditiously to arrive

at a contract so that school might begin in September and not be interrupted thereafter. The Sections read together clearly impose upon the Labor Relations Board the obligation, if it believes fact-finding should be used, to exercise its discretion in this direction, and indeed the phrase "[u]pon receiving such notice" suggests a prompt decision.

We do not intend, however, here to decide that the Labor Relations Board having determined, after certification, not to appoint a panel, may not later make a determination to the contrary, even after a strike has commenced. The Act does not explicitly deny this choice to the Board and circumstances could well suggest such action. However, if, as in this case, the notification of an impasse has been given and the Board has not acted, there are no procedures of Sections 801 and 802 then pending and a strike may proceed.

Order reversed.

---

CONCURRING OPINION BY JUDGE KRAMER:

While I concur in the result and the reasoning of the majority opinion, I feel compelled to register my concern with the following caveat.

Throughout this entire record, including the briefs of counsel, and argument before this Court, counsel for the parties have vigorously presented only two sides in this controversy, i.e., the teachers and the school district.

From my point of view, there is a third indispensable side to this case, which has been ignored. That is the side of the school children. In this Commonwealth, they have a constitutional right, as expressed in our Pennsylvania Constitution of 1968 at Article III, Section 14, to have a "thorough and efficient public education" provided for them.

All of the parties to this case and the majority opinion blithely speak of using "summer vacations" or holidays as a means of making up teachers' strike days to preserve state education subsidy funds. Not one word of concern is expressed for those school students who work on holidays and vacation days to stay in school. Not one word is utilized to protect high school seniors who must attend college summer school to gain admittance to college in the fall. Not one word is devoted to what happens if a high school senior's grades are not ready for timely submission to college for the fall admission. Not one word is said because the school children are not represented. They are the pawns in an adult game of economics. If the teachers and the school district agree to use all legal holidays, all weekends and all vacation time to make up for the lost days of a strike, does that mean the students will have no rest? Do they have any rights?

I believe the time has come to recognize their problems and rights. The students should be, in reality, the third party beneficiaries of all such negotiations and contracts. In view of the fact that almost all of the students involved in this case are under age of 18, and not represented by counsel, someone should look out for their rights. If the Attorney General, the Secretary of Education, and the Legislature do not provide for protection of those rights, then the courts should provide that protection.

Judge CRUMLISH, JR. joins in this concurring opinion.

————

CONCURRING AND DISSENTING OPINION BY PRESIDENT JUDGE BOWMAN:

I concur in the majority conclusion that the strike in question did not constitute a clear and present danger or threat to the health, safety or welfare of the pub-

lic at the time the strike was the subject of injunction proceedings. I must respectfully dissent, however, from the majority interpretation of Section 802 of the Act. I do agree with the majority that Section 802 clearly leaves the decision of whether a fact-finding panel should be appointed with the Board. I cannot agree that its non-action constitutes a determination that fact-finding should not be employed in this case or in any case in which it has not on its own motion, or in response to a request by one or both of the parties to a dispute, affirmatively made this critical determination.

This third step, recognized and prescribed by the Legislature for resolution of issues in the collective bargaining process, should not be so lightly set aside or made inoperative. It may very well be the step in the bargaining process which will resolve the dispute short of a strike and is clearly the only step prescribed by which the public is made aware of the issues which necessarily directly concern it as well as the public employers and employees concerned. For this reason I would affirm the order of the lower court.